**SUBAQUEOUS EXPLORATION & AR-CHAEOLOGY, LTD., and Atlantic Ship Historical Society, Inc., Plaintiffs,**

v.

**The UNIDENTIFIED, WRECKED AND ABANDONED VESSEL, Etc., et al., Defendants.**

Civ. A. Nos. 81–51, 81–52, 81–53.

United States District Court,
D. Maryland.

Dec. 21, 1983.

Raymond J. Cardillo, Baltimore, Md., for plaintiffs.

Stephen H. Sachs, Atty. Gen., Paul F. Strain, Asst. Atty. Gen., Baltimore, Md., for defendants.

## OPINION

### I. PROCEDURAL HISTORY

RAMSEY, District Judge.

Approximately two hundred years ago, three ships, believed to be carrying a king's ransom in gold altarplate and other riches, sank in the Atlantic Ocean after being battered by a fierce hurricane. The remains of these vessels and their cargo are currently submerged "under an undetermined amount of sand" off the shore of Ocean City, Maryland.

On January 13, 1981, plaintiffs Subaqueous Exploration & Archaeology, Ltd. ("Subaqueous") and Atlantic Ship Historical Society, Inc., citizens of Maryland, instituted the three,[1] above-captioned, *in rem* actions against defendants, the [three] Unidentified, Wrecked and Abandoned Vessel[s], believed to be the Santa Roselea, Royal George, San Lorenzo de Escoral, and Santa Clara, their respective tackle, armaments, cargo, and other effects pertaining to them.[2] The complaints expressly invoked this Court's admiralty and maritime jurisdiction pursuant to Rule 9(h) of the Federal Rules of Civil Procedure. Plaintiffs sought title to the abandoned vessels or, alternatively—full and liberal salvage awards to compensate them for their efforts to recover the vessels and their cargo. On January 13, 1981, this Court entered Orders directing that three warrants for arrest be issued for each abandoned vessel. On January 22, 1981, this Court entered Orders appointing Subaqueous as substitute custodian of the vessels effective upon their seizure by the United States Marshal for the District of Maryland. The Marshal arrested the vessels on January 31, 1981.

On March 12, 1981, this Court entered Orders directing the United States Marshal to publish notices of these actions as well as the arrests of the vessels. Such notices were published in the Baltimore Sun newspaper on March 24, 1981.

On April 9, 1981,[3] the State of Maryland, entering a special appearance and specifically preserving its sovereign immunity, filed motions to dismiss for lack of subject matter jurisdiction and to vacate the arrests of the seized vessels. In support

---

**1.** Although these three proceedings have not been consolidated, the Court nonetheless finds that the actions present identical questions of law and fact. Accordingly, the Court enters this Opinion to resolve all outstanding motions in all three cases.

**2.** Regardless of its identity, the defendant in Civil No. R–81–51, believed to be the Santa Rosealea, is the vessel "located within the area delineated by the coordinates 38° 23′ 06″ N, 75° 03′ 09″ W to 38° 23′ 06″ N, 75° 02′ 08″ W to 38° 25′ 00″ N, 75° 03′ 00″ W to 38° 25′ 00″ N, 75° 03′ 09″ W thence to the beginning." The defendant in Civil No. R–81–52, believed to be the Royal George, is the vessel "located within the area delineated by the coordinates 38° 25′ 00″ N, 75°

03′ 12″ W to 38° 25′ 00″ N, 75° 02′ 00″ W to 38° 27′ 04″ N, 75° 02′ 30″ W to 38° 27′ 04″ N, 75° 03′ 00″ W thence to the beginning." Similarly, the defendants in Civil No. R–81–53, believed to be the San Lorenzo de Escoral and Santa Clara, are the vessels "located within the area delineated by the coordinates beginning at 38° 19′ 40″ N, 75° 04′ 00″ W to 38° 19′ 04″ N, 75° 01′ 30″ W to 38° 22′ 00″ N, 75° 03′ 0″ W to 38° 22′ 00″ N, 75° 04′ 08″ W thence to the beginning."

**3.** On March 30, 1981, the Court approved a Stipulation by the parties providing that the State of Maryland would have until April 9, 1981, within which to file a claim in these proceedings.

thereof, the State contends that this forum lacks jurisdiction over the defendant vessels on the grounds that such vessels are the property of the State pursuant to both a state statutory scheme governing property found within its territorial waters and the State's sovereign prerogative, and that the Eleventh Amendment to the United States Constitution therefore bars these actions and plaintiffs' requested relief. The State also contends that this Court lacks subject matter jurisdiction over plaintiffs' admiralty and maritime claims on the grounds that the complaints fail to state causes of action for salvage, that the defendant vessels are not proper objects of petitory suits pursuant to Supplemental Admiralty Rule D, and that even if the defendant vessels were proper objects of petitory suits, plaintiffs have failed to effect proper service pursuant to Supplemental Admiralty Rule B(2).

On April 10, 1981, the State again expressly preserving its sovereign immunity, filed motions for amendments to orders appointing substitute custodian, which were directed at this Court's Orders entered January 22, 1981, appointing Subaqueous as substitute custodian of the defendant vessels. In support thereof, the State contends that the vessels are its property and that it should be appointed substitute custodian to ensure that the defendant vessels remain undisturbed pending final disposition of plaintiffs' claims. On May 11, 1981, this Court approved a stipulation by the parties which provided that plaintiffs would have sixty days within which to file their responses to the State's pending motions; that plaintiffs would not conduct any salvage operations on the vessels until they filed such responses; that the State would not be deemed to have waived any of its arguments or defenses raised in its pending motions as a result of its consent to the sixty-day extension; and that no custodial fees would accrue to plaintiffs

between the date that the State filed its motions and fifteen days after the date on which plaintiffs filed their responses thereto, unless the Court subsequently determined otherwise.

On August 26, 1981, plaintiffs filed their responses to the State's motions for orders appointing substitute custodian, and the motions to vacate arrests and to dismiss for lack of jurisdiction. In support thereof, plaintiffs contend that federal admiralty and maritime law governs these actions, not the state statutory scheme or the doctrine of sovereign prerogative as the State contends, even though the defendant vessels are located on submerged lands belonging to the State of Maryland; that the state statutes in question are unconstitutional in that they impermissibly intrude upon federal legislation regulating admiralty and salvage as well as the Submerged Lands Act, and are vague; and that the Eleventh Amendment does not bar federal jurisdiction over *in rem* proceedings in which the state's claims of ownership of the defendants are contested.

The Court stayed resolution of these questions pending the Supreme Court's decision in *Florida Department of State v. Treasure Salvors, Inc.,*[4] 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982). Pursuant to this Court's request, plaintiffs and the State filed supplemental memoranda addressing the jurisdictional questions presented in the instant proceedings in light of *Treasure Salvors.* In its supplemental memorandum on jurisdictional issues, the State of Maryland has advanced a two-pronged attack in support of its contention that this forum lacks jurisdiction to entertain these proceedings. First, the State argues that the Eleventh Amendment bars the invocation of this forum's jurisdiction on the grounds that these actions are suits against the State; that the seizures of the defendants' vessels were improper; that

---

**4.** The entire record of that proceeding is *Treasure Salvors, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel,* 459 F.Supp. 507 (S.D.Fla.1978), *aff'd sub nom., State of Florida, Department of State v. Treasure Salvors, Inc.,* 621 F.2d 1340 (5th Cir.1980), *cert. granted,* 451 U.S. 982, 101 S.Ct. 2312, 68 L.Ed.2d 838 (1981), *aff'd in part and rev'd in part,* 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982).

the State's claim of ownership over the defendant vessels is either valid or colorable within the meaning of *Treasure Salvors;* that further proceedings would serve no useful purpose; and that the State has not waived its Eleventh Amendment protection. The State also contends that its statutorily-based assertion of ownership of and jurisdiction over abandoned shipwrecks and its regulation of recovery activities do not violate the United States Constitution or impermissibly intrude upon federal laws regulating admiralty on maritime affairs. The State maintains that its challenged statutes are valid exercises of its police powers and within the powers granted by the Submerged Lands Act. Second, assuming the Eleventh Amendment does not bar these proceedings, the State contends that this Court lacks subject matter jurisdiction over these proceedings notwithstanding plaintiffs' invocation of this forum's powers respecting admiralty and maritime claims, on the grounds that plaintiffs have failed to state a cause of action under the law of salvage and finds, and that these actions do not bear a substantial relationship to maritime navigation or commerce.

In their supplemental memorandum, plaintiffs rely on their earlier memorandum, but further contend that the instant proceedings are not barred by the Eleventh Amendment in light of *Cobb Coin Co. v. The Unidentified, Wrecked and Abandoned Sailing Vessel,* 549 F.Supp. 540 (S.D.Fla.1982) (King, J.) (hereinafter "Cobb Coin II"), apparently the first reported case applying *Treasure Salvors.*

On October 21, 1982, this Court heard oral arguments by plaintiffs and the State of Maryland respecting the jurisdictional questions presented by these cases, and invited the State to submit a second supplemental memorandum addressing the jurisdictional issues in light of Judge King's opinion in *Cobb Coin II.* The State subse-quently filed a second supplemental memorandum on the jurisdictional issues that substantially reiterates the contentions detailed in its first supplemental memorandum.

Subsequently, John L. Amrhein, Jr., proceeding *pro se,* filed a motion to intervene in these proceedings pursuant to Rule 24(b) of the Federal Rules of Civil Procedure. In support thereof, Amrhein contends that he is a shareholder of Subaqueous; that he purchased his stock based on the claim by an officer of Subaqueous that the defendant vessels in these proceedings exist; that the defendant vessels are neither within the territorial jurisdiction of this forum "... nor in any other area of the world"; and that consequently, a certain officer of the plaintiff corporation committed fraud in selling him shares of Subaqueous. Neither plaintiffs nor the State of Maryland have filed responses to Amrhein's motion.

■■ The Court denies Amrhein's motion to intervene. Rule 24(b),[5] Fed.R. Civ.P., which governs permissive intervention, provides in pertinent part that "[u]pon timely application anyone may be permitted to intervene in an action: .... (2) when an applicant's claim or defense and the main action have a question of law or fact in common." The grant or denial of a motion to intervene pursuant to Fed.R.Civ.P. 24(b) rests within the discretion of the court, and its decision thereon will not be disturbed on appeal absent an abuse of such discretion. *See* Wright & Miller, *Federal Practice and Procedure: Civil § 1913* (1972) and cases cited therein. A review of applicable case-law reveals that permissive intervention should be denied where such intervention would delay or prejudice the adjudication of the rights of the original parties, *see, e.g., Degge v. City of Boulder, Colorado,* 336 F.2d 220 (10th Cir.1964); *Carpenter v. Wabash Ry.,* 103 F.2d 996 (8th Cir.1939), *rev'd on other grounds,* 309 U.S. 23, 60 S.Ct.

---

**5.** To the extent that Amrhein's grievance, liberally construed, constitutes a claim of stock fraud, the Court notes parenthetically that his motion fails to meet the standards of Fed.R. Civ.P. 24(a), which governs intervention of right. Rule 24(a) requires *inter alia* that the applicant show that "... he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest." Amrhein clearly can protect his interests by instituting a separate proceeding under a stock fraud theory.

416, 84 L.Ed. 558 (1940); where the applicant raises claims collateral or extrinsic to the questions presented in the original proceedings, even though the petition presents a common question of law or fact, *see, e.g., Sutphen Estates, Inc. v. United States,* 342 U.S. 19, 72 S.Ct. 14, 96 L.Ed. 19 (1951); *Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co.,* 315 F.2d 564 (7th Cir.), *cert. denied,* 375 U.S. 834, 84 S.Ct. 64, 11 L.Ed.2d 64 (1963); *City of Rockford v. Secretary of HUD,* 69 F.R.D. 363 (N.D.Ill. 1975); and where the intervenor's rights can be adequately protected in a separate proceeding, *see, e.g., Korioth v. Briscoe,* 523 F.2d 1271 (5th Cir.1975); *Clark v. Sandusky,* 205 F.2d 915 (7th Cir.1953); *United States v. 1,830.62 Acres of Land in Botetourt County,* 51 F.Supp. 158 (W.D.Va. 1943). *See generally* 3B Moore's Federal Practice ¶ 24.10[4] (1982) and cases cited therein. Upon consideration of the entire record in this proceeding, the Court finds on balance that Amrheim's claim of stock fraud is collateral and largely irrelevant to the thrust of the original action; that the adjudication of Amrheim's claim would unduly delay and complicate the adjudication of the controverted rights of the original parties and the State of Maryland; and that the applicant can adequately protect his rights by instituting a separate proceeding.

## II. JURISDICTIONAL ISSUES

In its motions to dismiss and to vacate arrests, the State of Maryland contends that this forum lacks jurisdiction over the defendants in these *in rem* proceedings, the vessels and their cargo, under the following two theories. First, the State argues that the Eleventh Amendment bars the maintenance of these proceedings and that, therefore, this Court's issuance of warrants of arrest for the vessels was improper. More specifically, the State maintains that the defendant vessels are located on state property pursuant to federal and state statutes; that the State is hereby the true owner of the vessels and their cargo; and that, consequently, the Eleventh Amendment precludes this Court from as-

serting jurisdiction over its property, or issuing arrest warrants directed at such property. Second, assuming *arguendo* that this Court's assertion of jurisdiction would be proper, to wit, not barred by the Eleventh Amendment, the State contends that plaintiffs' failure to effect proper service upon the State, as required by Supplemental Admiralty Rule D, fatally flaws this forum's exercise of *in rem* jurisdiction. The State maintains that plaintiffs failed to provide the State with proper notice of the warrants of arrest, either personally or by mail, as required by Supplemental Admiralty Rule B(2).

The Court finds that it lacks jurisdiction over the defendant vessels and their cargo. More specifically, upon review of controlling caselaw decided subsequent to the commencement of these proceedings, the Court finds that these actions are proceedings directly against the State of Maryland; that the State of Maryland has a colorable claim of possession of the defendant vessels and their cargo; that the State of Maryland has not waived its sovereign immunity or otherwise consented to the maintenance of these actions; and that consequently, the Eleventh Amendment to the United States Constitution prevents the maintenance of these proceedings. The Court, therefore, further finds that its Orders directing the United States Marshal to arrest the defendant vessels were improvidently issued, and that this Court improperly took possession of such vessels.

■ The Eleventh Amendment to the United States Constitution provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law of equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The Eleventh Amendment applies to actions brought against a state by its own citizens as well as citizens of another state. *See, e.g., Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct.

504, 33 L.Ed. 842 (1980). The Eleventh Amendment also applies to admiralty suits. *See, e.g., Treasure Salvors,* 102 S.Ct. at 3314 n. 17; *In re New York,* 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1921).

 As the Supreme Court has repeatedly construed the Eleventh Amendment, it bars the maintenance of a suit at law or equity "directly against the State itself, or against an agency or department of the State, unless the State has waived its sovereign immunity" or otherwise consented to the suit. *Treasure Salvors,* 102 S.Ct. at 3314, *citing Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam). *See also Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). However, the Eleventh Amendment's jurisdictional bar does not preclude an action against a state official that it based upon the theory that the state official in question "... acted beyond the scope of his statutory authority, or, if within that authority, that such authority is unconstitutional." *Treasure Salvors,* 102 S.Ct. at 3317. Even if the Eleventh Amendment does not bar the maintenance of a suit against the state official, the Eleventh Amendment nonetheless limits the nature of relief that may be obtained by the plaintiff. The Eleventh Amendments forbids a judgment or "liability which must be paid from public funds in the state treasury." *Id., quoting Edelman v. Jordan,* 415 U.S. at 663, 94 S.Ct. at 1355. *See also Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979) and cases cited therein. However, the Eleventh Amendment permits "prospective relief" that has an "ancillary effect" on the state treasury. *Treasure Salvors,* 102 S.Ct. at 3317; *Quern v. Jordan,* 440 U.S. at 337, 99 S.Ct. at 1143; *Edelman v. Jordan,* 415 U.S. at 668, 94 S.Ct. at 1358.

*Florida Department of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 102 S.Ct. 3304, 73 L.Ed.2d 1057 (1982), a plurality decision rendered by the Supreme Court, reconfirms these time-honored precepts of Eleventh Amendment jurisprudence, applies them in the context of an admiralty proceeding, and constitutes controlling authority for the questions presented in the instant proceedings. Because the underlying events in *Treasure Salvors* are striking both in their similarities and differences to the facts and circumstances of the instant actions, the history of that case merits a brief discussion. In *Treasure Salvors,* some treasure salvors, the plaintiffs-respondents therein, located an abandoned vessel, presumably the treasure-laden Atocha, off the coast of Florida. The State of Florida claimed title to the Atocha based upon a state statute which provided that abandoned items of archaeological value located on state-owned submerged lands belong to the State. The treasure salvors and the State of Florida's Department of Archives thereupon entered into a contract, which assumed state-ownership of the Atocha, wherein plaintiffs agreed to conduct salvage operations and the Division agreed to transfer ownership of seventy-five percent of all recovered materials to plaintiffs. Significantly, the contracts did not purport to transfer ownership of any salved properties to the Division. Subsequently, it was determined that the submerged lands upon which the Atocha was situated were outside the territorial jurisdiction of the State of Florida.

The treasure salvors thereafter filed an admiralty *in rem* action, seeking title to the abandoned vessel and naming the Atocha as defendant therein, not the State of Florida. The district court issued a warrant of arrest which was addressed to state officials of the Department of Archives in Tallahassee, Florida, who had actual possession and custody of some of the artifacts salved from the Atocha. The State of Florida filed a motion to quash the arrest warrant, raising *inter alia* the Eleventh Amendment as a defense. The district court held that the Eleventh Amendment neither barred seizure of the artifacts and their subsequent transfer to the United States Marshal nor prevented the court from resolving the controverted claims of ownership to such artifacts as between the

treasure salvors and the State. The Court of Appeals for the Fifth Circuit affirmed, holding that the Eleventh Amendment did not prevent the district court from determining the ownership of the artifacts since resolution of that question was critical to a determination of whether the Eleventh Amendment barred the exercise of jurisdiction by the federal court.

The Supreme Court granted the State of Florida's writ of certiorari to consider the following question: "Whether the Eleventh Amendment to the United States Constitution bars an *in rem* admiralty action seeking to recover property owned by a state." *Treasure Salvors*, 102 S.Ct. at 3313. Alternatively, the plurality opinion redefined "... [t]he difficult question presented [as] whether a federal court exercising admiralty *in rem* jurisdiction may seize property held by state officials under a *claim* that the property belongs to the state." *Id.* 102 S.Ct. at 3314 (emphasis added). The Supreme Court stated that the resolution of such Eleventh Amendment issue was governed by the following three-step test:

> (a) Is this action asserted against officials of the State or is it an action brought directly against the State of Florida itself? (b) Does the challenged conduct of state officials constitute an *ultra vires* or unconstitutional withholding of property or merely a tortious interference with property rights? (c) Is

the relief sought by Treasure Salvors permissible prospective relief or is it analogous to a retroactive award that requires "the payment of funds from the state treasury"?

*Id.* 102 S.Ct. at 3318. A plurality of the Supreme Court held that:

> the federal court had jurisdiction to secure possession of the property from the named state officials, since they had no colorable basis on which to retain possession of the artifacts. The court did not have power, however, to adjudicate the State's interest in the property without the State's consent.

*Id.* 102 S.Ct. at 3313.

 Thus, the rule of *Treasure Salvors* consists of two parts, one respecting the power of a federal court to issue an arrest warrant and the other respecting the power of a federal court to adjudicate title, and may be alternatively stated as follows. When the state has a colorable claim of possession of property and has not waived its sovereign immunity, the Eleventh Amendment bars a federal court from issuing an arrest warrant in an *in rem* admiralty proceeding.[6] When the state has not waived its sovereign immunity, the Eleventh Amendment bars a federal court from adjudicating the state's title to the property.[7]

---

**6.** Justice Brennan, concurring in part and dissenting in part, cast the decisive vote on the grounds that the Eleventh Amendment was "wholly inapplicable" to the case because it was a suit against a state by its own citizens. *Treasure Salvors*, 102 S.Ct. at 3323. Justice Brennan agreed with the plurality that the Eleventh Amendment did not bar issuance of the arrest warrant. However, he disagreed with all of his fellow Justices, finding that the federal court was not precluded from "determin[ing] the State's ownership of the artifacts as part of [its] Eleventh Amendment analysis." *Id.*

Excluding the opinion of Justice Brennan, the remaining Justices disagreed about the power of a federal court to issue an arrest warrant in light of the state's claim of ownership. In the plurality opinion, four Justices stated that "... since the state officials do not have a colorable claim to possession of the artifacts, they may not invoke the Eleventh Amendment to block execution of the warrant to arrest." *Id.* 102

S.Ct. at 3321. Four Justices dissented with the plurality, finding that the Eleventh Amendment barred the issuance of the arrest warrant as well as federal court adjudication of the state's title to the artifacts on the grounds that both matters were inextricably bound up. *Id.* 102 S.Ct. at 3327 ("Significantly, *In re New York (II)* did not distinguish between the service of process to arrest the *res* and the thrust of the libel itself to determine the rights in the vessel. I follow that course in this case, and refuse to sever the attempt to arrest the artifacts from the attempt to decide their ownership.").

**7.** Eight Justices in *Treasure Salvors* clearly agreed that the Eleventh Amendment bars a federal court from adjudicating a state's ownership of property absent the state's consent. *See id.* 102 S.Ct. at 3313, 3322 (plurality opinion); *id.* 102 S.Ct. at 3324 & note (White, J., concurring in part).

A. *The Suit is Against the State*

[11–13] Pursuant to the three-part test articulated in *Treasure Salvors,* the first question presented for this Court's consideration in determining whether the Eleventh Amendment bars the maintenance of these proceedings is whether these actions are suits directly against the State of Maryland or against its officials. Even though a state is not a named party to an action, the action nonetheless may be properly construed as a suit against the state if the state is the real or substantial party in interest, or the defendant-in-fact, in light of the "essential nature and effect of the proceeding." *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945); *In re New York,* 256 U.S. 490, 500, 41 S.Ct. 588, 590, 65 L.Ed. 1057 (1921) ("... it is now established that the question [of whether a proceeding is one against a state for Eleventh Amendment purposes] is to be determined ... by the essential nature and effect of the proceeding, as it appears from the entire record.") *See also Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Excess & Casualty Reinsurance Assoc. v. Insurance Commissioner of State of California,* 656 F.2d 491, 497 (9th Cir.1981); *Blake v. Kline,* 612 F.2d 718 (3d Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980); *Jones v. George,* 533 F.Supp. 1293 (S.D.W.Va.1982). Likewise, where the action is essentially one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its Eleventh Amendment defense even though its individual officials are nominal defendants. *See Ford Motor Co.,* 323 U.S. at 464, 65 S.Ct. at 350; *Great Northern Insurance Co. v. Read,* 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944). To determine whether an action is one against the State, a federal court should refer to applicable state law. *See, e.g., Ford Motor Co.,* 323 U.S. at 463–64, 65 S.Ct. at 350; *Aerojet-General Corp. v. Askew,* 453 F.2d 819, 828 (5th Cir.1971); *Cobb Coin II,* 549 F.Supp. at 552.

The State of Maryland contends that the instant proceedings are suits directly against it pursuant to state statute and decisional law. Plaintiffs contend that the statutes upon which the State of Maryland relies do not directly pertain to or govern underwater salvage operations.

▆▆▆ Upon review of applicable federal and state statutes in light of the facts and circumstances of these cases, the Court concludes that these proceedings clearly are suits directly against the State of Maryland within the meaning of *Treasure Salvors* and *Ford Motor Co.* Plaintiffs and the State of Maryland agree, and the Court so finds that the defendant vessels and their cargo are situated off the shore of Ocean City, Maryland. The Court further finds that the defendant vessels and their cargo are within the territorial jurisdiction of this forum. This finding is predicated in part upon the Submerged Lands Act of 1953, 43 U.S.C. § 1301 *et seq.,* which provides in pertinent part that "[t]he seaward boundary of each original coastal State is approved and confirmed as a line three miles distant from its coast line ..." *Id.* § 1312. Furthermore, the Submerged Lands Act vested "title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters" in the states. *Id.* § 1311(a). Section 2–309 of Maryland's Natural Resources Article, entitled "[o]wnership and deposit of archaeological objects and materials," provides that "[a]ny object or material of historical or archaeological value or interest found on an archaeological site or land owned or controlled by the State is the property of the State." Md.Nat.Res.Code Ann. § 2–309 (1983).

The Court finds that these federal and state statutes, fairly and reasonably construed, fully support the State of Maryland's contention that these actions are suits directly against it. The remains of the defendant vessels and their cargo can only be characterized as objects or materials of historical or archaeological value

within the meaning of Md.Nat.Res.Code Ann. Their cargo is believed to include gold altarplate and other riches. In addition it is certainly reasonable to assume that these vessels would also contain other items representative of the culture and lifestyle of people who lived over two centuries ago. Section 2–309 expressly declares that such historical objects are the property of the State of Maryland provided they are situated on state-owned or state-controlled land. The Submerged Lands Act establishes that the submerged lands or the "undetermined amount of sand" under which the remains of these vessels and their cargo are situated belong to the State of Maryland.

Plaintiffs in these proceedings filed *in rem* admiralty complaints, seeking that they be declared owners of certain "unidentified, wrecked, and abandoned vessels, . . . their tackle, armaments, cargo, and other effects pertaining to them," or, alternatively, that they be granted an award for salvage services to compensate them for their recovery efforts. The complaints specifically name the vessels as defendants therein. Consequently, these suits are directly against vessels over which the State of Maryland asserts a claim of title. As such, the essential nature and effect of these proceedings are that they are suits directly against the State of Maryland. Moreover, assuming that the State of Maryland owns the defendant vessels and their cargo, to the extent that plaintiffs' seek a salvage award, such award would be payable from the State treasury. Under these circumstances, *Ford Motor Co.* directs that these are actions directly against the State of Maryland. *Ford Motor Co.*, 323 U.S. at 464, 65 S.Ct. at 350.

The Court further finds that the instant proceedings are significantly factually distinguishable from *Treasure Salvors* in one critical respect, and such factual difference is highly persuasive, or even dispositive, on the question of whether these proceedings are suits directly against the State of Maryland for Eleventh Amendment purposes. In *Treasure Salvors*, state officials had been actively and intimately involved

with the treasure salvors' efforts to recover artifacts from the Atocha. In *Treasure Salvors*, the salved artifacts that were the objects of both the arrest warrant and the entire dispute were in the actual possession and custody of state officials. Unlike *Treasure Salvors*, however, conspicuously absent from these proceedings is any allegation by plaintiffs that a Maryland state official has acted outside the scope of his statutory authority or pursuant to an unconstitutional grant of authority. No objects have been recovered from the defendant vessels, and consequently no state official has actual or constructive possession of such objects. In the instant proceedings, the State of Maryland asserts a claim of possession or ownership of the vessels and their cargo exclusively on the basis of state and federal laws. Absent any allegation of conduct by state officials respecting the defendants in these proceedings, it is abundantly clear that these proceedings are suits directly against the State of Maryland for purposes of the Eleventh Amendment.

B. *The State Has a Colorable Claim of Possession of the Defendant Vessels and Their Cargo*

Pursuant to the rule established by *Treasure Salvors*, the second question presented for this Court's consideration in determining whether the Eleventh Amendment bars these actions is whether the State of Maryland has a colorable claim of possession of the defendant vessels and their cargo. *Treasure Salvors* directs that when a state has a colorable claim of possession of a defendant res in an *in rem* admiralty action and has not waived its sovereign immunity, the Eleventh Amendment bars the issuance of an arrest warrant addressed to such property. 102 S.Ct. 3313. *Treasure Salvors* also directs that when a state has not waived its sovereign immunity, the Eleventh Amendment forbids a federal court from adjudicating the state's title to such property. 102 S.Ct. 3313, 3322 (plurality opinion). *See also* 102 S.Ct. 3324 (concurring opinion in pertinent part).

The State of Maryland contends that it has a colorable claim of possession and ownership of the defendant vessels and their cargo. As mentioned earlier, the State's claim is grounded squarely on the Submerged Lands Act of 1953, 43 U.S.C. § 1301 *et seq.* and state statutes, particularly including Md.Nat.Res.Code Ann. § 2–309.[8] The State specifically argues that its statutes provide a colorable claim of possession and ownership of the vessels and their cargo; that such statutes are not unconstitutionally vague in terms of their application to the defendants in these proceedings; that such statutes do not impermissibly intrude upon federal law regulating admiralty, maritime affairs, and salvage operations; that its statutes are valid exercises of its police powers; and that such statutes are within the powers granted by the Submerged Lands Act.

Plaintiffs contend that the State of Maryland lacks a colorable claim of possession and ownership of the defendant vessels and their cargo. In support thereof, plaintiffs argue that the state statutes in question constitute an unconstitutional intrusion into the exclusive federal regulations of admiralty and maritime matters, including salvage operations; that such state statutes also unpermissibly intrude into the federal powers reserved under the Submerged Lands Acts; that even if such state statutes were constitutional and not otherwise infirm, they nonetheless are inapplicable to underwater salvage operations; that Md. Nat.Res.Code Ann. § 2–309 is unconstitutionally vague; and that the Eleventh Amendment therefore does not preclude the maintenance of these suits.

■■■ The Court finds that the Submerged Lands Act of 1953, 43 U.S.C. § 1301 *et seq.* and Md.Nat.Res.Code Ann. § 2–309, fairly and reasonably construed, fully provide a colorable basis for the State of Maryland's claim of possession of the defendant vessels and their cargo. As mentioned earlier, the Submerged Lands

Act confirmed the coastal states' title to and proprietary rights in the lands beneath navigable waters within three geographical miles from the coast line, *see* 43 U.S.C. §§ 1312, 1311(a), with the capacity to exercise dominion and control thereover subject to Congress' reserved right to regulate commerce, navigation, national defense, and international affairs, *see id.* § 1314. *See, e.g., United States v. California,* 436 U.S. 32, 37, 98 S.Ct. 1662, 1664, 56 L.Ed.2d 94 (1978) (Submerged Lands Act "transferred dominion" over submerged lands to state); *United States v. Alaska,* 422 U.S. 184, 187, 95 S.Ct. 2240, 2245, 45 L.Ed.2d 109 (1975); *United States v. Maine,* 420 U.S. 515, 525, 95 S.Ct. 1155, 1160, 43 L.Ed.2d 363 (1975) ("the Submerged Lands Act did indeed grant to the States dominion over the offshore seabed within the limits defined in the Act)." This Court has already found that the defendant vessels and their cargo are situated on submerged lands belonging to the State of Maryland. Section 2–309 of Maryland's Natural Resource Article expressly declares that items of historical or archaeological value situated on state-owned or state-controlled land are the property of the State of Maryland. Md.Nat.Res.Code Ann. § 2–309. This Court has already found that the defendants in these proceedings are items of archaeological or historical value within the meaning of section 2–309. Consequently, these federal and state statutes provide a colorable basis for the State of Maryland's claim of possession of the vessels and their cargo.

Furthermore, the Court notes that four Justices in *Treasure Salvors* found that the Florida statute at issue therein was "an indisputably valid state statute, ... providing title to treasure trove abandoned on state-owned submerged lands." *Treasure Salvors,* 102 S.Ct. at 3330 (White, J.). The Court finds that Md.Nat.Res.Code Ann. § 2–309 is substantially similar to that Florida statute.

---

8. Throughout the course of these proceedings, the State of Maryland has also relied upon Md. Code Ann. Art. 78A, § 15 (1980) and Md.Nat.

Res.Code Ann. §§ 2–303, 2–305, 2–306, and 9–101 (1983) to support its contentions.

1. *The State Statutes Neither Unconstitutionally Intrude Upon Nor Are Preempted by Federal Law.*

 The Court also finds, as applied to the facts and circumstances of these proceedings, that the State of Maryland's statutory scheme regulating historical and archaeological objects found on its submerged lands, as contained in Maryland's Natural Resource Article, does not unconstitutionally intrude upon federal laws governing admiralty and maritime affairs, including salvage, and furthermore, that such state statutes provide a colorable basis for Maryland's claim of possession of the defendant vessels and their cargo. Briefly stated, plaintiffs contend that the challenged state statutes upon which Maryland predicates its claim of title unconstitutionally intrude upon the exclusively federal domain of admiralty and maritime affairs, are preempted by federal law, and must, therefore, bow to federal law pursuant to the Supremacy Clause of the United States Constitution. The State of Maryland contends that its statutes, upon which its claim of possession and title of the defendants in these actions is grounded, are valid exercises of its police powers and do not unconstitutionally intrude upon federal law.

 Preliminarily, it is well-established that a state's police powers may be exercised to preserve and regulate the use of resources necessary for the public welfare. *See, e.g., Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948); *Skiriotes v. Florida,* 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941). Cultural or aesthetic interests are proper objects of public welfare which the state may protect pursuant to its police powers. *See, e.g., E.B. Elliott Advertising Co. v. Metropolitan Dade County,* 425

F.2d 1141 (5th Cir.), *cert. denied,* 400 U.S. 805, 91 S.Ct. 12, 27 L.Ed.2d 12 (1970). The Court finds that the State of Maryland's public policy of protecting and preserving historical and archaeological objects found on its lands, as articulated in Md.Nat.Res. Code Ann. § 2–303, falls within the range of public welfare interests protectable under its police powers.

 With respect to preemption and conflicts between state and federal laws, it is, of course, a fundamental principle of constitutional jurisprudence that the Supremacy Clause invalidates state laws that "interfere with, or are contrary to the laws of Congress ..." *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 211, 63 L.Ed. 23 (1824). However, the "exercise of federal supremacy is not lightly to be presumed." *New York Department of Social Services v. Dublino,* 413 U.S. 405, 413, 93 S.Ct. 2507, 2513, 37 L.Ed.2d 688 (1973), *quoting Schwartz v. Texas,* 344 U.S. 199, 203, 73 S.Ct. 232, 235, 97 L.Ed. 231 (1952). "Preemption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.'" *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 522, 101 S.Ct. 1895, 1905, 68 L.Ed.2d 402 (1981), *quoting Chicago & North Western Transportation Co. v. Kalo Brick & Telephone Co.,* 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981).

 More specifically with regard to federal preemption of conflicting state law in the realm of admiralty and maritime affairs, the controlling rules of law,[9] as recently articulated by the Supreme Court in *Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 339, 93 S.Ct. 1590, 1599, 36 L.Ed.2d 280 (1973), hold as follows:

---

9. Plaintiffs' reliance on the rules of preemption contained in *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), is misplaced. The *Jensen* holding has been circumscribed by subsequent decisions of the Supreme Court. *See, e.g., Askew v. American*

*Waterways Operators, Inc.,* 411 U.S. 325, 338, 93 S.Ct. 1590, 1598, 36 L.Ed.2d 280 (1973); *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 769 (1959). *See also Steuart Transportation Co. v. Allied Towing Corp.,* 596 F.2d 609, 620–21 (4th Cir.1979).

[A] State, in the exercise of its police power, may establish rules applicable on land and water within its limits, even though these rules incidentally affect maritime affairs, provided that the state action 'does not contravene any acts of Congress, nor work any prejudice to the characteristic features of the maritime law, nor interfere with its proper harmony and uniformity in its international and interstate relations.'

*See also Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960); *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 769 (1959); *Skiriotes v. State of Florida,* 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941); *Just v. Chambers,* 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941); *Kelly v. State of Washington,* 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3 (1937). *See also Steuart Transportation Co. v. Allied Towing Corp.,* 596 F.2d 609, 621 (4th Cir.1979) ("Federal legislation does not supersede a state statute based on the police powers unless Congress has manifested a clear intention to preempt the field or the state statute actually conflicts with the federal law."), *citing Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 157–58, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). However, such limitations on state regulation of maritime affairs "... still leaves the states a wide scope." *Askew,* 411 U.S. at 338, 93 S.Ct. at 1598, *quoting Romero,* 358 U.S. at 373, 480. Thus, a state may enact laws on matters of local concern pursuant to its police powers which "incidentally affect maritime affairs" without impermissibly intruding upon federal regulation of admiralty or maritime matters. *Askew,* 411 U.S. at 339, 93 S.Ct. at 1599; *Huron Portland Cement Co.,* 362 U.S. at 445–46, 80 S.Ct. at 817. *See generally* G. Gilmore & C. Black, Jr., *The Law of Admiralty* 43–45 (1957). As stated by Justice Stewart in his dissenting opinion in *Oil Workers v. Mobil Oil Corp.,* 426 U.S. 407, 435–36, 96 S.Ct. 2140, 2154, 48 L.Ed.2d 736 (1976),

It is unnecessary here to delineate the 'wide scope' within which the States may legislate about things maritime. To re-

fute the notion that the high seas are a species of federal enclave, it is sufficient to point out that the Court has found state legislation pre-empted *only* when the nature of the problem required the application of a uniform rule or when the state law unduly hampered maritime commerce .... The Court has never struck down a state law on the ground that the States are jurisdictionally incompetent to legislate over matters that occur within the ocean 'territory.' (citations omitted) (emphasis in text).

The Court finds that there is no comprehensive federal statutory scheme regulating the recovery of marine antiquities from state submerged lands, and that, consequently, the laws contained within the State of Maryland's Natural Resources Article are not in direct or actual conflict with a federal statute. Likewise, none of the federal statutes regulating tangentially related matters conflict with the challenged state statutes. The Antiquities Act, 16 U.S.C. §§ 431–433, which designates and regulates historic monuments and other objects of antiquity situated on lands owned or controlled by the United States, does not apply to state submerged lands. *See United States v. California,* 436 U.S. 32, 98 S.Ct. 1662, 56 L.Ed.2d 94 (1978). The Abandoned Property Act, 40 U.S.C. § 310, which authorizes the Administrator of General Services to protect federal interests in "wrecked, abandoned, ... or derelict" property "being within the jurisdiction of the United States, and which ought to come to the United States," does not apply to "wreckage of any kind ..." *United States v. Tyndale,* 116 F. 820, 822 (1st Cir.1902). While the Marine Sanctuaries Act, 16 U.S.C. §§ 1431–1434, authorizes the Secretary of Commerce to designate certain areas of ocean waters as marine sanctuaries, including waters lying within the territorial limits of a state, the Court is unaware of any such designation having been made to waters within the territory of the State of Maryland.

The Court further finds that Maryland's Natural Resource Article, as applied to the

facts and circumstances of these proceedings, does not directly conflict with or contravene federal statutes or constitutional powers respecting admiralty and maritime matters, particularly including salvage and salvors' rights within the meaning of *Askew* and the previously-cited authorities. While the Salvage Act, 46 U.S.C. §§ 721–731, generally provides for salvors' rights and regulates salvage operations, the Court discerns no direct or actual conflict between these federal statutes and the state laws at issue in this proceeding. Notwithstanding federal regulation of admiralty and maritime affairs, including salvage, "... there are numerous instances in which the general maritime law has been modified or *supplemented* by state action ..." *Just v. Chambers*, 312 U.S. at 388, 61 S.Ct. at 691 (emphasis added), and cases cited therein. The state regulations under challenge herein address themselves exclusively to objects of archaeological or historical value found on lands owned or controlled by the State of Maryland. Given their narrow geographic scope of applicability, the Court finds that such statutes, insofar as they may affect salvage operations directed toward objects of historical and archaeological value, merely have an incidental effect upon or supplement federal maritime laws or powers, and, consequently, do not impermissibly intrude upon federal laws.

The Court also finds, contrary to plaintiffs' contentions, that Maryland's Natural Resources Article, as applied to the facts and circumstances of these proceedings, does not disrupt a characteristic feature of maritime law where uniformity is required within the meaning of *Askew*. The admiralty law of salvage was developed in pertinent part to encourage seamen to render assistance to maritime property in imminent peril. *See generally* G. Gilmore & C. Black, Jr., *supra*, § 8–1 and cases cited therein. Indeed, one of the three elements of a valid salvage claim is the existence of a marine peril. *See e.g., Legnos v. M/V Olga Jacob*, 498 F.2d 666, 669 (5th Cir. 1974). The marine peril required "... need not necessarily be one of imminent and

absolute danger. The property must be in danger, either presently or reasonably to be apprehended." Norris, *The Law of Salvage* § 185 (1958), *quoted in Platoro Limited v. Unidentified Remains of Vessel*, 614 F.2d 1051, 1055 (5th Cir.1980) *and Cobb Coin II*, 549 F.Supp. at 557. However, the defendant vessels in these proceedings have been resting on the ocean floor "under an undetermined amount of sand" for hundreds of years. This forum declines to follow the recently developed rule in the Fifth Circuit that an ancient, abandoned shipwreck constitutes a marine peril for purposes of stating a valid salvage claim. *See, e.g., Cobb Coin II*, 549 F.Supp. at 557 and cases cited therein. Rather, the Court finds that the defendant vessels are not reasonably in peril of being lost through the elements since they are "impervious to weather conditions above the surface of the sea," with the "sand prevent[ing] deterioration under water." *Platoro Limited v. Unidentified Remains of a Vessel*, 508 F.2d 1113, 1114–15 n. 1 (5th Cir.1975).

The Court, therefore, finds under the circumstances that the traditional public policy concerns underpinning the federal law of salvage are insufficiently implicated, if at all, when the objects to be rescued are marine antiquities which have been undisturbed for centuries. The challenged sections of Maryland's Natural Resources Article clearly do not interfere with the rescue of recently wrecked or damaged vessels. Moreover, the state statutes at issue here should not impair the uniformity of admiralty salvage laws. Maryland's laws apply only to recovery operations directed toward historical or archaeological items found within its territorial waters. The Court questions whether there are a sufficient number of ancient abandoned shipwrecks lying within the territorial waters of the coastal states so as to warrant uniform regulation by Congress. Furthermore, the fact that a treasure salvor would be subjected to different state regulations depending upon the situs of an ancient, abandoned shipwreck fails to present a

compelling reason calling for uniform federal regulation.

In addition, the Court also finds that Maryland's Natural Resources Article focuses on matters of peculiarly local concern, the preservation and regulation of historical or archaeological objects found within its territory for the benefit of its citizens. The defendant vessels and their cargo, when they are successfully recovered, promise to provide the public with an invaluable opportunity to learn about the culture of people who explored or travelled to the shores of the United States two centuries ago.

2. *The State Statutes are Within the Powers Granted to the States by the Submerged Lands Act.*

The Court also finds that the State of Maryland's statutory scheme regulating historical or archaeological objects located on lands owned or controlled by the State, as contained in Maryland's Natural Resources Article, are within the powers granted to the states by the Submerged Lands Act. Plaintiffs contend that Congress' intent in enacting the Submerged Lands Act was to permit the coastal states to manage and develop the exploitation of ore resources contained within their submerged lands, and that the rights granted to the states by that federal Act do not encompass the right to regulate the recovery of abandoned shipwrecks resting within their territorial waters. The Court finds that plaintiffs' construction of the rights granted to the states by the Submerged Lands Act is unduly narrow, and therefore, declines to adopt it.

Section 1311 of the Submerged Lands Act, which set forth the rights and powers granted to the states, provides that:

[i]t is determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the *right and power to manage, administer, lease, develop, and use the*

*said lands and natural resources* all in accordance with applicable State law be, and they are, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the respective States .... (emphasis added).

43 U.S.C. § 1311(a). Section 1314, which sets forth the rights and powers retained by the federal government, provides that:

[t]he United States retains all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs, all of which shall be paramount to, but *shall not be deemed to include, proprietary rights of ownership, or the rights of management, administration, leasing, use, and development of the lands and natural resources which are specifically recognized, confirmed, established, and vested in and assigned to the respective States and other by section 1311 of this title.* (emphasis added)

*Id.* § 1314(a). Section 1301, which defines natural resources for the purposes of the Act, provides that:

The term "natural resources" *includes*, without limiting the generality thereof, oil, gas, and all other minerals, and fish, shrimp, oysters, clams, crabs, lobsters, sponges, kelp, and other marine animal and plant life but does not include water power, or the use of water for the production of power. (emphasis added).

*Id.* § 1301(e).

■ The Court finds that the rights and powers granted to the states by the Submerged Lands Act include the right of the State of Maryland to regulate the ownership and recovery of marine artifacts or abandoned shipwrecks situated on submerged lands within its territory. Although Congress' primary intention in enacting the Submerged Lands Act may have been to allow the states to regulate the exploration of ore resources within their submerged lands, as plaintiffs contend, the Act plainly granted the coastal states far broader powers. While the Act expressly

vested ownership in the states of natural resources within their submerged lands, the Act also expressly vested title and ownership of the submerged lands themselves in the states *see* 43 U.S.C. §§ 1311(a), 1314(a), as well as the right and power to manage, develop, and use such lands. *See id.; Moore v. Hampton Roads Sanitation District Commission,* 557 F.2d 1030, 1034 n. 7 (4th Cir.1976) ("The Submerged Lands Act, 43 U.S.C. § 1301 *et seq.,* recognized in § 1311(a) the right of the several states to manage, administer, lease, develop and use lands beneath the navigable waters within the boundaries of each state in accordance with applicable State law . . ."). It appears to the Court that a state's regulatory rights respecting its submerged lands would include the power to regulate objects found in, on, or buried beneath such submerged lands, including abandoned shipwrecks and their cargo. Furthermore, even though the ships and their cargo are "man-made" or objects not created exclusively through the forces of nature, those marine antiquities can be characterized as "natural resources" within the meaning of the Submerged Lands Act. By its plain terms, the definitional section of natural resources within that Act is not all-inclusive. The remains of abandoned, two hundred year old shipwrecks, which have lain undisturbed for centuries under an undetermined amount of sand, reasonably can be characterized as natural resources for purposes of the federal Act.

3. Section 2–309 is Not *Unconstitutionally Vague.*

◼ The Court finds that section 2–309 is not unconstitutionally vague. Plaintiffs contend that Md.Nat.Res.Code Ann. § 2–309, for whose violation criminal penalties may be imposed, *see id.* § 2–310, fails to contain a definition of the terms "historical" or "archaeological" or any other means to determine their meaning, and is, therefore, unconstitutionally vague. Plaintiffs rely on *United States v. Diaz,* 499 F.2d 113 (9th Cir.1974), in which the Ninth Circuit held that the federal Antiquities Act, 16 U.S.C. § 433, was unconstitutionally vague and violated due process because it failed to define "ruin," "monument," or "object of antiquity."

◼ A penal statute is unconstitutionally vague if it fails to provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). *See also Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). A court should examine whether the challenged language, when measured by common understanding and practice, conveys a sufficiently definite warning as to the proscribed conduct. *See United States v. Petrillo,* 332 U.S. 1, 8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1974).

The Court finds that the challenged terms are not indefinite, vague, or uncertain. "Historical" items refer to objects pertaining or characteristic of past events. *See* Random House College Dictionary 628 (rev. ed. 1980). "Archaeological" items refer to objects pertaining to historic peoples or their dwellings and artifacts. *See id.* at 69. When measured by common understanding and practice, the challenged language of Md.Nat.Res.Code Ann. § 2–309 clearly gives a person of ordinary intelligence a reasonable opportunity to know that the remains of two hundred year old vessels and their cargo would be subject to Section 2–309's regulation of historical or archaeological objects and a claim of ownership by the State of Maryland, provided such items were situated on land owned or controlled by the State of Maryland.

Furthermore, the Court declines to follow the Ninth Circuit's construction of the federal Antiquities Act as set forth in *United States v. Diaz,* 499 F.2d 113 (9th Cir.1974). In *United States v. Smyer,* 596 F.2d 939 (10th Cir.1979), a more recent decision, the same federal statute was upheld notwithstanding a similar challenge to its constitutionality on the grounds of vagueness. Moreover, the facts of the instant proceedings are more closely akin to

those of *Smyer* than *Diaz*. In *Diaz*, the objects at issue were masks which were approximately five years old. In *Smyer*, the defendants were charged with excavating objects from a seven hundred year old Indian burial ground.

## C. *The State Has Not Waived Its Sovereign Immunity.*

■ The Court finds that the State of Maryland has not waived its sovereign immunity throughout the course of these proceedings. The State has expressly preserved its sovereign immunity in each motion that it has filed and in presenting oral arguments on the questions raised in these actions.

■ In conclusion, the Court finds for purposes of determining whether the Eleventh Amendment bars the maintenance of these proceedings that these actions are suits directly against the State of Maryland, that the State of Maryland has a colorable claim of possession of the defendant vessels and their cargo, and that the State of Maryland has not waived its sovereign immunity or otherwise consented to these actions. Under such circumstances, the Eleventh Amendment bars the maintenance of these proceedings. Consequently, the Court grants the State of Maryland's motions to dismiss. In addition, the clear rule of *Treasure Salvors* directs that in an *in rem* admiralty proceeding the Eleventh Amendment bars a federal court from issuing arrest warrants directed at vessels over which a state has a colorable claim to possession. Therefore, the Court finds that its Orders entered January 13, 1981, directing the United States Marshal to seize the defendant vessels and their cargo, were improvidently issued. Accordingly, the Court grants the State of Maryland's motions to vacate the arrests of the defendant vessels. The grant of the State of Maryland's motions to dismiss and to vacate the arrests of the defendant vessels and their cargo also requires this Court to vacate its Orders entered January 22, 1981, appointing Subaqueous as substitute custodian of the vessels.

For the reasons stated herein, it is this 21st day of December, 1983, by the United States District Court for the District of Maryland,

ORDERED:

1. That the State of Maryland's motions to dismiss complaints and vacate arrests are GRANTED;

2. That the Orders entered January 22, 1981, appointing Subaqueous as substitute custodian are vacated; and

3. That the Clerk of the Court shall mail copies of this Opinion to the State of Maryland and all counsel of record.

10/83

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SUBAQUEOUS EXPLORATION & ARCHAEOLOGY, LTD., and ATLANTIC SHIP HISTORICAL SOCIETY, INC. <br> VS. <br> THE UNIDENTIFIED, WRECKED AND ABANDONED VESSEL (Believed to be the SANTA ROSALEA) her tackle armament, apparel, cargo and other effects | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * CIVIL ACTION NO. R–81–51 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### JUDGMENT

In accordance with the ~~Memorandum and Order~~ Opinion dated December 21, 1983 and filed in the above entitled case it is

ORDERED and ADJUDGED: that the State of Maryland's motion to dismiss complaint and vacate arrests are GRANTED and case is DISMISSED and that the Orders entered on January 22, 1981, appointing Subaqueous as a substitute custodian are vacated. —————————————————————————————————————

Dated at Baltimore, Maryland this ___21st___ day of ___December___ , 19 _83_ .

PAUL R. SCHLITZ, CLERK

By: _____

Deputy Clerk

10/83

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

SUBAQUEOUS EXPLORATION & AR- *
CHAEOLOGY, LTD., and ATLANTIC SHIP *
HISTORICAL SOCIETY, INC. *
 VS. *
THE UNIDENTIFIED, WRECKED AND * CIVIL ACTION NO. R–81–52
ABANDONED VESSEL (Believed to be the *
ROYAL GEORGE) her tackle armament, *
apparel, cargo and other effects *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### JUDGMENT

Opinion

In accordance with the Memorandum and Order dated ___December 21, 1983___ and filed in the above entitled case it is

ORDERED and ADJUDGED: that the State of Maryland's motion to dismiss complaint and vacate arrests are GRANTED and case is DISMISSED and that the Orders entered on January 22, 1981, appointing Subaqueous as a substitute custodian are vacated. —————————————————————————————————————

Dated at Baltimore, Maryland this ___21st___ day of ___December___ , 19 _83_ .

PAUL R. SCHLITZ, CLERK

By: _____

Deputy Clerk

10/83

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SUBAQUEOUS EXPLORATION & AR-CHAEOLOGY, LTD., and ATLANTIC SHIP HISTORICAL SOCIETY, INC. <br> VS. <br> THE UNIDENTIFIED, WRECKED AND ABANDONED VESSEL (Believed to be the SAN LORENZO DE ESCORAL) her tackle armament, apparel, cargo and other effects and THE UNIDENTIFIED, WRECKED AND ABANDONED VESSEL (Believed to be the Schooner SANTA CLARA) her tackle, armament, apparel, cargo and other effects | CIVIL ACTION NO. R–81–53 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JUDGMENT

Opinion

In accordance with the Memorandum and Order dated December 21, 1983 and filed in the above entitled case it is

ORDERED and ADJUDGED: that the State of Maryland's motion to dismiss complaint and vacate arrests are GRANTED and case is DISMISSED and that the Orders entered on January 22, 1981, appointing Subaqueous as a substitute custodian are vacated.

Dated at Baltimore, Maryland this 21st day of December , 19 83 .

PAUL R. SCHLITZ, CLERK

By: _Paul Hansen_

Deputy Clerk